## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    CRIMINAL NO. 3:2006-31 |
| | ) |
| JAMIE RICHARDSON, | )    JUDGE GIBSON |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on Jamie Richardson's (Defendant) Motion to Suppress (Document No. 28). The Court is presented with circumstances which are somewhat unique regarding the permissibility of federal law enforcement's use of ruses to gain consensual entrance to a residence and also to obtain consent for a search of the hard drives of two computers in the absence of probable cause or a search warrant. On March 27, 2007, the Court heard testimony and admitted evidence during a hearing on the Defendant's motion. In light of the findings of fact based upon that testimony and evidence and conclusions of law based upon the extant precedents regarding law enforcement ruses from various federal courts of appeal, the motion will be granted in part and denied in part.

## FINDINGS OF FACT

1. In July 2006, Special Agent Patricia Lieb (Lieb) of Immigration and Customs Enforcement (ICE), Pittsburgh Office, was assigned a case involving Jamie Richardson (Defendant) as a result of "Operation Emissary." Transcript ("T."), p.7.

2. "Operation Emissary" is the name for an investigation conducted by the Newark, New Jersey Office of ICE that concerned people who subscribed to or attempted subscription to an internet website entitled "ILLEGAL.CP" which was a website that published child pornography; "CP" refers to child pornography. T., p.8

3.     As a result of information provided from the Newark ICE office, Lieb was aware that a person attempted subscribing to "ILLEGAL.CP" in January 2006 and February 2006 through the email address of "JamieLeeR@yahoo.com". T.pp.8-9.

4.     Newark ICE believed this email address belonged to the Defendant who resided at 1529 Pitt Road in Altoona, Pennsylvania and had concluded that the computer from which someone had attempted the subscription had an Internet Protocol (IP) address that was registered to the Defendant at the same address. T., p.9.

5.     Also among the available evidence was information related to the credit card account that was used in the attempted subscription and such information revealed that no charge was reflected on the credit card account because the "credit card was not functioning at the time"; a credit card charge of $79.99 was necessary to access the website. T., pp. 9-10.

6.     Lieb admits that the whole of this information which was received form Newark ICE did not establish that the Defendant or the person using "Jamie LeeR@yahoo.com" actually accessed the website in question, only that access was "attempted". T., p. 10.

7.     Armed with this evidence, Lieb along with two other Pittsburgh ICE agents, Kenneth Rochford (Rochford) and James Kilpatrick (Kilpatrick), decided to approach the Defendant at his residence and inquire further as to the credit card account in question and the Defendant's "activity over the Internet." T., pp. 11, 100-101.

8.     Lieb did not apply for a search warrant prior to visiting the Defendant's website and personally did not believe probably cause existed to conclude child pornography was located on the computer in question because access to the website was never granted, but only attempted. T., pp. 11, 83.

9.     On September 6, 2006, at "approximately 11:10 in the morning" Lieb, along with Rochford and Kilpatrick and a police officer form Logan Township, Blair County, Pennsylvania approached the Defendant's home at 1529 Pitt Road in Altoona, Pennsylvania. T., pp.12, 80-81.

10.    Lieb knocked on the Defendant's door, the Defendant answered, and then Lieb and Kilpatrick, who were standing "at the door" produced their identification and badges for the Defendant and indicated to him in a "causal, polite" tone that they would like to speak to him regarding "some [of his] credit card activity over the Internet and [they] were looking into it and would like to talk to them[1] regarding that activity"; Rochford and the Logan Township police officer stood

[1]Apparently Lieb was referring to the Defendant and his wife, Gabrielle, collectively in this comment. Defendant's wife was the only other person in the residence at this time, but the Defendant's daughter came home later in the afternoon. T., pp. 15, 22, 71.

2

"off to the corner of the residence". T., pp. 12-15, 16, 62, 81.

11.     The Defendant invited Lieb, Kilpatrick and Rochford into his home in order to speak to these agents regarding the Internet and his credit card activity; the Logan Township police officer departed from the residence at this time. T., pp. 13, 14.

12.     Lieb was dressed "causally" that day, "with a windbreaker that said ICE on it", with her firearm at her waist, not drawn but holstered and obscured from view by her windbreaker.[2]  T., p. 13.

13.     Once inside the residence, Lieb repeated the purpose of her visit to both the Defendant and his wife while sitting at the "kitchen table"; in response, the Defendant and his wife recounted occurrences to Lieb and the other agents regarding possible past theft of their identities, "issues with their computer in Germany, as well as some mail that they had received and some other problems and issues with their credit cards at two different banks." T., pp. 15, 16, 17, 82-84.

14.     In approaching the Defendant in his doorway and during the conversation in the Defendant's kitchen, Lieb did not indicate to the Defendant that she had the intention of "investigating the possibility that he was in possession of child pornography" although this was her intent when she arrived at the Defendant's home. T., pp. 16, 60, 63, 70, 82.

15.     The only purpose of the agents in referring to the fact that someone had improperly used Defendant's credit card was to secure his cooperation; and the content of what was told to the Defendant was not false. T., pp. 101-102.

16.     The Defendant and his wife provided documentation regarding "disputed...transactions with two different banks,...Commonwealth Band and...Citizens Bank." T., p. 17.

17.     The Defendant broached the subject of child pornography by informing the agents that he previously "had a problem with child pornography on his computer or over his e-mail in Germany" and had at that time "approached either the German or the FBI authorities or both while he was in Germany, that he cleaned out that computer and then he passed it on to his father-in-law." T., pp. 17-18, 90.

18.     The Defendant and his wife further offered in the discussion that certain occurrences, including previously unauthorized charges to their "credit cards and bank accounts" and a previous

---

[2]Rochford was wearing "a pair of jeans and a polo shirt," and his "standard issue gray vest" and also possessed his firearm but never drew it. T., p. 82.

3

telephone call from a "telemarketer" may have resulted in theft of their identities. T., p.

19.   The Defendant and his wife initiated the discussion concerning identity theft and Lieb did not prevent the discussion regarding identity theft and considered it to be "a possibility of [her] investigation" in light of the fact that another suspected subscriber to "ILLEGAL.CP" had used a stolen credit card to access that website. T., pp. 19-20.

20.   The topic of identity theft was discussed before and after consent was provided to image the two hard drives; Lieb never told the Richardsons "that they may be subject to any type of criminal penalty". T., pp. 70, 98-99.

21.   During this entire discussion, the Defendant never felt that he "[was] a suspect in criminal activity". T., pp. 113, 129.

22.   Lieb made an inference to the Richardsons that they were victims of identity theft "throughout the entire time that [the agents] were there". T., p. 79.

23.   While these aforementioned topics were discussed throughout the approximately four hours the agents were present in the Defendant's residence, it was approximately within fifteen minutes after Lieb had entered the Defendant's home that she requested the Defendant's "consent to image his hard drives". T., pp. 20-21, 30-31, 84-85, 96.

24.   The Defendant agreed in writing to the requested search of two computer hard drives in his possession as found in Government Exhibits 1 and 2, both of which are forms entitled "CONSENT TO SEARCH COMPUTER(S)"; these forms were presented to the Defendant by Kilpatrick and Mrs. Richardson witnessed the Defendant's signature on Government Exhibit 1 and Lieb witnessed the signature on Exhibit 2. T., 22-23, 116-117, 128.

25.   Kilpatrick had filled in the information in the blank spaces of the consent forms with the exception of the date, signature and address lines on the bottom half of the form. T., pp. 23-25.

26.   The Defendant examined the two forms and appeared to have read both forms; no agent read aloud the contents of the forms to the Defendant; after reviewing each of these forms, the Defendant asked questions regarding the need to remove the computers from the home in order to conduct the search and Lieb answered these questions. T., pp. 23, 58-59, 76-77, 85-86.

27.   The Defendant was never read his Miranda rights as Lieb believed the conversation to be "a consensual encounter." T., p. 32.

28.   Government Exhibits 1 and 2 were not presented to the Defendant at the same time; Lieb informed the Defendant that he could refuse the requested consent and her request was

4

presented in a "polite agreeable voice"; neither Lieb nor Rochford threatened the Defendant or promised something to him, or otherwise exhibited a firearm or "physically touch [ed]" the Defendant in an attempt to secure his consent. T., pp. 24, 26, 27, 87.

29.    Lieb indicated that the purpose of searching the hard drives was to search "[f]or Internet activity" but she did not describe to the Richardsons which "violation of law" she was investigating. T., p.32; Government Exhibit 2.

30.    The Defendant did not appear to be under the influence of any alcohol or illegal substance at the time of providing his consent and the Defendant's responses to questions, while at times "stray[ing] from the direct question" were "responsive." T., pp. 28, 92.

31.    Lieb admits that "[i]n some definitions for a ruse-I may have used a ruse in the initiation of the interview" and described her tactic as such: "I explained to him that there was some credit card activity over the Internet and it was his credit card, however, I didn't explain exactly what it was for, what the activity was or the website that was accessed." T., pp. 28-29.

32.    Although Rochford did not believe Lieb's tactic was a ruse, he agreed that the Defendant was only told that his credit card may have been used for "illegal activity" over the Internet by "someone", but was never told that what the "illegal activity was". T., pp. 92-94, 98.

33.    Lieb's statement to the Defendant regarding "illegal activity" was true, but was not complete in that it did not describe Operation Emissary or Lieb's knowledge about all of the facts concerning the Defendant's attempted credit card and computer use. T., pp. 28-30.

34.    The subject of "identity theft" was initiated by the Richardsons and brought up prior to and after the Defendant granted his consent reflected in Government Exhibits 1 and 2. T., pp. 30, 32, 99-100.

35.    Lieb did use the word "victim" during her conversation with the Richardsons, but not prior to requesting consent to image the hard drives. T., pp. 74, 78, 88, 113.

36.    The Defendant believed the forms were being presented to him in an effort to help the agents investigate the possibility of the Defendant being a victim; the Defendant contends that he signed them without "car[ing] about reading them". T., pp.113-114, 116-117.

37.    After consent was provided by the Defendant, Kilpatrick, a computer forensic investigator, "image[d]" the hard drives of two computers owned by the Defendant; to "image" means to "mak[e] a duplicate of the hard drive...so that anything that is on that hard drive could not be corrupted or changed, it would make a copy of it and then he would look at that copy." T., pp. 21-22, 26, 88-89.

5

38. The hard drives were never physically removed from the Defendant's residence during the conversation. T., p. 22.

39. During the course of the imaging of the Hewlett Packard hard drive, a period of at least three hours but not more than five hours, the Defendant and his wife were interviewed by Lieb and Rochford at the kitchen table of the residence; the parties took occasional breaks but at no time did the Defendant rescind his consent, end the interview, request an attorney or direct the agents to leave his home and for the duration he remained "cooperative." T., pp. 32-33, 88-89, 91, 98, 115, 129.

40. The Richardsons provided to the agents all their bank statements they had received since returning to the United States in April 2004 in an effort to facilitate what the Defendant believed to be a theft of his identity. T., p. 114.

41. After the imaging of the Hewlett Packard hard drive was complete, *see* Government Exhibit 1, rather than await a second imaging, the agents requested permission to physically remove the second hard drive found in the Nascar PC by CISNET from the Richardson's home in order to review its contents in the agents' Pittsburgh office and the Richardsons consented to this action. T., p. 33.

42. The agents left the Richardsons' home at "approximately 4:45 p.m." Lieb indicated to the Defendant "[t]hat [ICE] would continue the investigation into the credit card use online and the Internet activity, and [they] would see what [they] could get off the computers and [they] would be in touch and/or [the Defendant] could be in touch with me." T., pp. 33, 73, 77.

43. Subsequently, Kilpatrick did a forensic analysis on both hard drives from the Richardson home which revealed "over 3,000 images of child pornography or suspected child pornography, as well as 11 video[s]." T., p. 34.

44. From the portions of this material that Lieb viewed, she concluded that all children depicted in the photos and videos were under the age of eighteen. T., p. 34.

45. Lieb later had "at least two... possibility three" telephone conversations with the Defendant with Lieb and the Defendant each initiating at least one of the conversations; the conversations concerned the Defendant's concern for "some mail that he thought was of suspicious nature", and "on another occasion [Lieb and the Defendant] made arrangements to meet [in Lieb's] office" and finally they spoke about "further credit card transactions and disputes and some information [the Defendant] had regarding those disputes that he wanted to give [Lieb]." T., pp. 35-36.

6

46.    During the second telephone conversation, Lieb indicated to the Defendant that she wanted to meet with him again and requested that he come to her Pittsburgh office and Richardson willingly agreed to do so, indicating that he could be in Pittsburgh on September 22, 2006 when his wife had to attend an appointment regarding her "immigration status"[3] in the same office building. T., pp. 36-37, 38, 39.

47.    Lieb requested that the Defendant bring the hard drive from the Hewlett Packard, which was previously imaged at his residence, to Pittsburgh on September 22, 2006 for their meeting and the Defendant indicated that he would do so; Lieb never indicated why she wanted the Defendant to bring the heard drive to their meeting, but she believed from the review of the imaged copy of that hard drive, that the actual drive contained child pornography. T., pp. 37-38.

48.    The Defendant "voluntarily" arrived at Lieb's office at "[a]pproximately noon" and Lieb met the Richardsons in the building's lobby and escorted the Defendant up to the third floor of the building into a visitor conference room because access to the third floor is restricted from the public by a separate elevator. T., pp. 39-40, 74, 115.

49.    After arriving in the conference room, the Defendant gave Lieb the documents concerning the "disputed transactions" he previously mentioned as well as the Hewlett Packard hard drive; subsequent to receiving these items, Lieb told the Defendant that "numerous images of child pornography" were found on the two hard drives in question to which the Defendant responded with "surprise." T., pp. 40, 41, 115, 138.

50.    Lieb did not administer Miranda warnings to the Defendant because despite her questioning, she did not attempt to place him in custody as she told "him he was not under arrest" and told him on "several" "occasions" "he was free to leave" "at any time." T., pp. 40-41.

51.    The Defendant voluntarily proceeded to state that any child pornography could only have gotten on the heard drives through his actions and not someone else's actions, but the Defendant did not admit to storing the images intentionally but initially indicated that they may have been mingled with emails and websites that contained adult pornography and that he may have unintentionally opened the images and "immediately closed" them. T., pp. 41-42.

52.    However, "as the interview progressed [the Defendant] said well, he may have opened the child pornography image." T., p. 42.

53.    Lieb offered the Defendant restroom breaks and drinks; Lieb was dressed casually and conversed with the Defendant without "rais[ing] [her] voice or yell[ing] at him", and without

_____

[3]Gabrielle Richardson is originally from Germany and was in the process of applying for residency in the United States. T., pp. 36-37, 111, 126.

7

making any threats or promises or touching the Defendant and did not have her weapon in her possession during the course of the interview. T. pp. 42-43, 45, 46.

54.    During the interview the Defendant voluntarily wrote a statement under oath on "Customs Form 4604B" and "4604C", initialing the first page and signing the second and Lieb also signed the second page-this statement has been introduced as Government Exhibit 3. T., pp. 43-44, 133.

55.    Lieb did not direct the Defendant what to write in this statement. T., p. 133

56.    The statement reflected in Government Exhibit 3 indicates that the Defendant believed the child pornography was placed on his hard drives when he attempted to view what he believed to be adult pornography. T., pp. 44-45.

57.    The first interview between Lieb and the Defendant lasted from approximately "noon to about 1:50 [p.m.]" when the Defendant voluntarily left this interview at his request to join his wife downstairs in the same building so she could "put in her [residency] application" and he then indicated that he wanted to continue the interview with Lieb after he was finished with his wife's residence affairs. T., pp. 37, 45-46, 134.

58.    Lieb honored the Defendant's request to end this interview; the Defendant made his request at 1:50 p.m. T., pp. 133-134.

59.    The statement set forth in Government Exhibit 3 was written by the Defendant "just minutes before he left." T., p. 137.

60.    After approximately forty-five minutes, at 2:45 p.m., the Defendant returned to the third floor and stated to Lieb that he had "spoke[n] to his wife [outside of the building] and told her about the child porn being on his computer, and that she was surprised and upset...but that there's some things that he wanted to tell [Lieb] and to correct his statement." T., pp. 46-47, 130-131, 139.

61.    Lieb lead the Defendant back into the conference room along with Speical Agent Michael Opferman (Opferman) and began a second conversation with the Defendant; Lieb did not have her firearm with her, she was dressed casually and did not advise the Defendant of his Miranda rights at this time and indicated to him "that he could leave at any time" and "that he was not under arrest." T., pp. 45, 48, 103-104, 106.

62.    Opferman, who was unarmed, never threatened or promised "anything" to the Defendant and did not come in physical contact with Defendant and never "raised [his] voice" to the Defendant. T. P. 107.

8

63.    In this second interview of September 22, 2006, the Defendant admitted to saving the child pornography on his computers' hard drives because "he did not look at child pornography because he was interested in little girls but because he was looking for the mindset that was involved in people that looked at child pornography, why they looked at it"; in support of this contention, the Defendant indicated "that his niece had been molested as a young girl and he was curious." T., p. 49.

64.    The second interview continued "between one hour and five minutes and one hour and fifteen minutes"; the Defendant was "offered food or drink [and] use of the restrooms." T., p. 49.

65.    Lieb was seated and used a "tone of voice" that was "polite and conversational" during this interview as she never yelled or "rais[ed] [her] voice to the Defendant as he was "polite" and "cooperative"; the Defendant did not "appear to be under the influence of any drug or alcohol" during this interview and had no difficulty communicating and never indicated that he wished to stop the interview or speak with an attorney. T., pp. 50, 55.

66.    As a result of the second interview, the Defendant voluntarily made a second, two page statement under oath, signed by the Defendant and witnessed by Opferman and also signed by Lieb found in Government Exhibit 4, which reflects the stated intent of the Defendant in viewing child pornography in an attempt to understand why persons take advantage of children in that way; the Defendant indicated that he believed that of all of the pornography on the hard drives "1/4 [is] child porn." Government Exhibit 4; T., pp. 51-52, 105, 134-135.

67.    Lieb did not tell the Defendant "what to write...[o]n the second statement"; the statement was "compos[ed]" by the Defendant "throughout the interview" and he began to do "shortly after he came back into [the ICE] office". T. Pp. 135, 137.

68.    During the second interview, the Defendant also remarked to Lieb that in regard to her arriving at his residence on September 6, 2006 and his possession of child pornography, "I had an idea that's why you guys were there." T., p. 56.

69.    The Defendant also indicated to Lieb that he does not recall "access[ing]" an image that apparently was obtained on the morning of September 6, 2006; the Defendant also revealed that he would view the child pornography "three to four times a week" and "they were little girls between ages of 10 and 16 years of age." T., p. 57.

70.    It was confirmed that the female minors depicted on the computer files were "between the ages of [ten] and [sixteen] years old." T., p. 135.

71.    The second interview concluded at "[a]pproximately 4:00 [p.m.]" and the Defendant was permitted to leave, was not arrested, and was told that Lieb would be contacting him regarding

9

"any further developments regarding the child pornography on his computer." T., pp. 53, 107.

72. The "next contact" Lieb had with the Defendant was when she arrived at his residence on October 12, 2006 accompanied by "ICE special Agent James Stitzel [(Stitzel)] and a Logan Police Department Officer" to place the Defendant under arrest. T., p. 54.

73. The Defendant was "advised" of his Miranda[4] rights through Lieb's reading of a preprinted form found at Government Exhibit 5, to which the Defendant responded that "he understood his rights" and that he did not wish to speak to Lieb without an attorney and then requested legal counsel; Lieb noted the Defendant's response and request on Government Exhibit 5 and no "further conversation" occurred between the Defendant and Lieb. Government Exhibit 5; T., pp. 54-55.

## CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

2. "It is...well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-2044, 36 L.Ed.2d 854, 858 (1973)(citations omitted).

3. [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte,* 412 U.S. 218, 248-249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973)(citations omitted).

---

[4]*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4.  Consent to search is determined through an evaluation of the totality of the circumstances. *Schneckloth* at 227, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854, 862-863.

5.  The Government has the burden of proof to demonstrate that consent to search was given by preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974). *See also United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

6.  "Without question, the home is accorded the full range of Fourth Amendment protections." *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312, 316 (1966)(citations omitted).

7.  It has been recognized that law enforcement cannot conduct a warrantless search under the pretense that a crime has been committed when in fact it has not. *United States v. Phillips*, 497 F.2d 1131 (9th Cir. 1974)(finding a violation of the Fourth Amendment warrant requirement when police officers were voluntarily admitted to a building under the guise that a burglary had taken place therein when in fact admittance was sought to arrest an individual believed, but unknown to be inside)(citing *Lewis, supra*).

8.      It is settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993); *see also United States v. Matthews*, 32 F.3d 294, 298 (7th Cir. 1994); *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990); *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974), *cert denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).

*U.S. v. Leveto*, 343 F.Supp.2d 434, 442 (W.D.Pa. 2004).

9.  The Court finds the testimony of Lieb and Rochford to be credible as compared to the testimony of the Defendant.

10. Lieb and her fellow ICE special agents obtained the Defendant's voluntary consent to enter into the Defendant's home and this consent was secured from the Defendant after Lieb indicated that she wished to speak with the Defendant concerning illegal activity regarding the use of his credit card over the Internet.

11. Thus Lieb, Rochford and Kilpatrick entered the Defendant's home under the "pose" of being ICE special agents investigating attempted illegal activity concerning the Defendant's credit card account. *See United States v. Ressler*, 536 F.2d 208, 211 (7th Cir. 1976)("When an agent

11

assumes a particular pose in order to gain entry into certain premises and then obtains information by engaging in activity not generally expected of one assuming that pose, that information is illegally obtained.")

12. Once inside, Lieb let the Defendant and his wife's concerns regarding the possibility of an identity theft take hold as a result of an implication from Lieb's general statements regarding activity rising to a criminal nature that involved the Defendant's credit card and any computer equipment in his possession.

13. The Defendant, concerned that he was a victim of a crime, granted consent to Lieb and the other ICE agents to search his computers by means of imaging one computer's hard drive and physically removing the second computer and its hard drive from the Defendant's home.

14. Lieb embraced the Defendant's view that he was a victim of a crime by failing to reveal her true belief that the Defendant was in fact the person attempting to use his own credit card to illegally obtain child pornography.

15. Lieb, Rochford or Kilpatrick's failure to reveal the object of their investigation, *i.e.* an attempted purchase of child pornography over the Internet, did not cause the Defendant's voluntary consent to their entry into his home to be in violation of the Fourth Amendment. *See Brown v. Brierley*, 438 F.2d 954, 958 (3d Cir. 1971)("If the police must announce their investigatory intentions even when acting openly in their official capacities, it might well follow that the police also must explain their purposes to criminal suspects when carrying out undercover investigations in which it is necessary that the police camouflage their identity.")

16. Further investigation concerning the agents' suspicion of the existence of child pornography on any computer in the Defendant's possession necessitated a second search which was also required to be permissible under the Fourth Amendment as such contraband was not otherwise available to or in plain view of the ICE special agents during their presence within the Defendant's home.

17. Lieb provided consent to search forms to the Defendant that permitted a search of the entire contents of the Defendant's two computers while Defendant proceeded under the impression that he was a victim of identity theft and did not know that Lieb suspected him of possessing child pornography.

18. Lieb's act of seeking and obtaining consent from the Defendant to search the two computers in his residence was in fact part of a ruse in that she permitted the Defendant to believe that he was a victim of a crime when in fact she believed him to be a suspect of a crime.

12

19. In this sense, the case *sub judice* differs from *Brown, supra* in that Brown was read his rights and was questioned "regarding several unsolved murders." *Brown* at 956.

20. While Lieb suspected that the Defendant possessed child pornography, she did not believe she possessed evidence sufficient to establish probable cause of that fact and still harbored the thought that the Defendant was not the person who attempted to access the child pornography website, although her belief in such a conclusion was not as strong as her belief in the conclusion that the Defendant did in fact attempt the access of "ILLEGAL.CP".

21. As a result of Lieb's failure to discount the Defendant's belief that he was a victim of a crime, Lieb was given the Defendant's voluntary consent to search his computers for evidence that he was indeed a victim of a crime.

22. In light of the fact that Lieb could not confirm or deny the presence of child pornography on the computers in question or that the Defendant was a victim of a crime, the Defendant's consent granted to ICE was not akin to a warrantless search based upon a fabrication of a crime as in *Phillips* or otherwise a warrantless consent that permitted viewing of matters beyond the "very purposes contemplated by the [owner]" as in *Lewis, supra*.

23. By comparison, if Lieb arrived at the Defendant's home and indicated to him that a crime was committed by another person, when in fact no such crime occurred, and she used that indication to otherwise gain entry into the Defendant's home and gain his consent to search his computers and other effects, such a scenario would be the equivalent of the suggestion of the occurrence of a burglary in *Phillips* that permitted law enforcement's entry into a building without a search warrant and while knowing that a burglary did not occur.

24. However, Lieb's subsequent actions in obtaining the Defendant's Hewlett Packard computer through the Defendant's consensual relinquishment to Lieb at the ICE office in Pittsburgh do violate the Fourth Amendment warrant requirement.

25. The Defendant's relinquishment of the Hewlett Packard computer at ICE's Pittsburgh office was pursuant to the understanding that he was still a victim of identity theft despite the fact that ICE and, specifically Lieb, confirmed their suspicion and erased any doubt they had concerning the presence of child pornography on this computer.

26. Lieb requested the Defendant give the Hewlett Packard computer to ICE with the intent to investigate his potential criminal acts while allowing the Defendant to continue to believe he was cooperating with ICE in an effort to investigate his alleged victimization due to what the Defendant believed to be theft of his identity.

13

27. Knowing child pornography to be on the computer, Lieb requested the Defendant to bring the Hewlett Packard into her office in Pittsburgh without telling the Defendant that child pornography was found on the copy of its hard drive or that the investigation no longer concerned identity theft.

28. In allowing the Defendant to continue to believe he was a victim of identity theft, Lieb in essence gained possession of the computer through misleading the Defendant in violation of the Fourth Amendment despite the fact that probable cause existed for the issuance of a search warrant for the Hewlett Packard.

29. The Hewlett Packard computer, including its hard drive, was therefore obtained through a violation of the Fourth Amendment and must be excluded from evidence pursuant to the exclusionary rule, *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 91963), unless this evidence could be admissible by means of an exception to the exclusionary rule.

30. Therefore, the specific question that is presented to the Court is whether the Hewlett Packard computer and hard drive can be demonstrated by the Government to eventually be subject to lawful seizure through the inevitable discovery rule or the independent source doctrine in light of the fact that the Government possessed a copy of the Hewlett Packard's hard drive, *see Nix v. Williams*, 467 U.S. 431, 440-448, 104 S.Ct. 2501, 2507-2511, 81 L.Ed.2d 377, 385-390 (1984)(discussing the inevitable discovery rule) and *United States v. Herrold*, 962 F.2d 1131, 1139-1140 (3d Cir. 1992)(comparing inevitable discovery rule and independent source doctrine), and in the absence of the parties' discussion of such an issue, the Court will order further limited briefing on this issue and the possible application of these two doctrines to the Hewlett Packard hard drive.

31. Turning to the Defendant's challenge to the admissibility of his statements made to Lieb, the Defendant's two conversations with Lieb on September 22, 2006 were based upon the discovery of child pornography found within the evidence ICE had already lawfully obtained, *i.e.* the copy of the Hewlett Packard hard drive and the Nascar PC by CISNET, and, in fact, Lieb began her first conversation indicating that child pornography was found in these articles.

32. Therefore, the Defendant's two conversations with Lieb on September 22, 2006 are not tainted by the inadmissible evidence because Lieb engaged in the conversations with the Defendant making known to him that the investigation centered on his possession of child pornography and not the possibility of him being a victim of identity theft.

33. The Court further finds that the statements produced by the Defendant on September 22, 2006 are contradictory in that the first statement, Government Exhibit 3, indicated the Defendant's mistaken viewing of child pornography while the later statement, Government Exhibit 4,

14

reveals an intent on the part of the Defendant to view child pornography for the purpose of understanding why some people take sexual advantage of minors; such contradiction coupled with the Defendant's testimony before the Court leads the Court to conclude that the Defendant is not a credible witness.

34.    The determination of whether someone is "in custody" turns on the question of whether a reasonable man in the Defendant's position would feel he is deprived of his "freedom of movement." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-1529, 128 L.Ed.2d 293, 293-298 (1994).

35.    The Court does not find as credible the Defendant's claims that he was not permitted to leave the conference room until Lieb granted him permission to leave.

36.    Thus, the Defendant's two statements to Lieb on September 22, 2006 were made voluntarily while the Defendant was not in custody and they are not "fruit of the poisonous tree." *Wong Sun*, at 487-488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963).

## CONCLUSION

The Government legally obtained consent to enter the Defendant's residence and image the hard drive of the Hewlett Packard computer and physically gain possession of the second Nascar PC by CISNET through the means of a ruse. The ruse was that the ICE agents implied without explicitly stating, and otherwise permitted the Defendant and his wife to suppose that they were victims of identity theft without discounting such a belief and that the ICE agents were present to investigate this possible identity theft. Actually, the agents believed that it was likely that the Defendant had in fact attempted unsuccessfully to purchase a subscription to a child pornography website based upon the information obtained from Operation Emissary with regard to the Defendant's credit card account number, physical address, computer IP address and possible email address. The ruse was a permissible tool to obtain the Defendant's consent to enter his residence and subsequently search these articles because the ICE agents were obtaining a view of matters that one would view if they were investigating

15

a possible theft of one's identity over the Internet. Indeed the ICE agents had not excluded the possibility that the Defendant was a victim of identity theft when they first approached him and requested his consent to review the contents of his computers. The ICE agents' review of the copy of the Hewlett Packard hard drive and the Nascar PC by CISNET computer was thus consensual and permitted under the Fourth Amendment. However, once the ICE agents confirmed the presence of child pornography on the Hewlett Packard hard drive and continued to allow the Defendant to believe he was a victim of identity theft and proceeded to request that he produce the actual Hewlett Packard computer, such production by the Defendant under the ICE agents' continued guise of investigating identity theft was not consensual under the Fourth Amendment and the Hewlett Packard computer itself must be excluded from evidence at trial absent the Government demonstrating that it would have obtained that computer in another lawful manner under the Fourth Amendment. Because the Defendant's statements of September 22, 2006 were obtained based upon references to lawfully obtained evidence, such statements are admissible at trial.

An appropriate Order follows.

16

**AND NOW**, this 3rd day of August, 2007, in consideration of the Defendant's Motion to Suppress (Document No. 28) and after a hearing thereon, IT IS HEREBY ORDERED THAT the motion is CONDITIONALLY GRANTED IN PART as to the Defendant's Hewlett Packard computer, and such piece of evidence shall be excluded at the time of trial unless further briefing of the parties and review of the record by this Court mandates a contrary ruling; and DENIED IN PART as to the image of the Defendant's Hewlett Packard computer, the Nascar PC by CISNET, and the Defendant's statements of September 22, 2006.

IT IS FURTHER ORDERED THAT the parties shall present briefs regarding the admissibility of the Hewlett Packard computer through application of the inevitable discovery rule or the independent source doctrine on or before August 31, 2007 with said briefs being no more than five pages.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

17